# STATE v. CLARK.

No.7371.   Decided October 24, 1950. (223 P. 2d 184)

See 61 C. J. S., Motor Vehicles, Sec. 666. Criminal Negligence defined in prosecution for involuntary manslaughter, 161 A. L. R. 1. See, also, 26 Am. Jur. 297.

*Arthur H. Nielsen,* Salt Lake City, for appellant.

*Clinton D. Vernon,* Atty. Gen., *Quentin L. R. Alston, Allen B. Sorensen, Mark K. Boyle,* Asst. Attys. Gen., for respondent.

PRATT, Chief Justice.

Appellant was convicted of involuntary manslaughter arising out of an automobile collision killing a passenger in appellant's car.

The principal question submitted by appellant upon this appeal is that of the sufficiency of the evidence to support a conclusion that appellant was driving his automobile recklessly, or in a manner evidencing a marked disregard for the safety of others.

There is little or no controversy between the parties as

to the testimony and evidence in the case. A brief summary of the testimony in the case is:

The complaint arose out of an automobile accident which occurred on December 16, 1948, approximately 11:30 p.m., at or near 2800 South State Street, in Salt Lake County. Prior to the accident the defendant had been operating a 1940 Buick automobile in a northerly direction on State Street. With him were the deceased and two other young people riding in the front seat and five other people riding in the rear seat, making a total of nine people in the automobile. The highway was icy and slippery, but defendant was operating his car at about the same speed as other cars ahead of him when his car began to slide to the left over across the center line and into the path of a southbound Packard automobile being operated by Jack R. Price. Before either of the two drivers were able to reduce the speed at which they were traveling the automobiles came together head on, injuring several of the passengers in defendant's automobile and resulting in the death of John Dale Cutler, a passenger in the front seat of defendant's car.

Six witnesses were called on behalf of the State, to wit: Jack R. Price (the driver of the other vehicle involved in the accident), Van E. Porter (a photographer who took some pictures at the scene of the accident some time after it occurred), Donald W. Rice (a passenger in defendant's automobile), and three Highway Patrolmen who participated in investigating the accident (Russell Cederlund, Charles G. Fogle, and Raymond DeVine). In order that a complete picture be obtained of the State's case, the testimony of these witnesses will be summarized.

Jack R. Price testified that he was driving a 1947 Packard sedan automobile belonging to Dr. Ellertson of Murray, Utah, in a southerly direction on State Street in the lane next to the center of the highway; that he had traveled in

the same lane most of the way down State Street, except when passing other cars. It was cold and the streets were continually icy—very icy. He had observed that condition earlier in the evening as he drove up State Street from Murray. There were no cars immediately ahead of him as he traveled south, and as he neared the point where the accident occurred he was traveling about 35 miles an hour. On cross-examination Mr. Price admitted he had told officers immediately after the accident that he was traveling between 30 and 40 miles an hour; that he could have been going a little faster than 35 miles or a little slower. During the moments before the accident and up to the time it occurred, he did not change the course of his automobile from one lane of traffic to another. He observed four or five automobiles approaching from the south in a normal fashion, when one of the automobiles came over to the west side of the highway "into my line of traffic, and I would estimate it would be two or three hundred feet down the highway." At that time, upon suggestion of the prosecuting attorney (and over objection of defense counsel) the witness further stated that he thought the other car was attempting to pass the other cars ahead. However, on cross-examinaion the witness admitted that he could not tell from the movement of the other car what the driver was attempting to do; that he didn't know how the other car got into the lane in which the witness was traveling. Thereupon the court determined that it had been wrong in overruling defendant's objection to the testimony in this respect and admonished the jury to disregard what the witness said as to "what this witness thought the defendant was trying to do".

At the time the northbound automobile came into the lane occupied by the southbound car, the witness testified that he couldn't tell from that distance whether the other automobile was skidding or not. At that time the cars were between two hundred and three hundred feet apart. From

then, until the cars were about 50 feet apart, the witness did nothing to turn into another lane of traffic to avoid an accident, but continued in a straight course down the highway. Immediaely prior to the time the car came over into the wrong lane, there was the normal procession of cars going northward and there were no other cars in the immediate vicinity going south. When the other car came within 50 feet of the witness he observed that it was then in the process of skidding. He further admitted that he had more than one and one-half seconds (after allowance for reaction time) in which to change the course of his automobile had he desired to do so after he first saw the other car come into his lane of travel, but that he did nothing to avert the accident.

Donald Rice, who was a passenger in defendant's automobile, testified that he had been with the deceased on the day of the accident, and that the two of them had met the defendant up town. After they met they went out to the Municipal swimming pool and from there to the Stork Club on South State Street, approximately 34th South. Altogether there were five boys in the crowd. At the Stork Club they met four girls and the group danced and sat around for approximately an hour and a half, during which time two pitchers of beer were consumed—two glasses for each person. About 11:15 p. m. the group (nine in all) left the Club and got into the defendant's automobile and started up State Street. The defendant, Helen Johansen, John Dale Cutler (the deceased), and Ruby Aldrich sat in front while the witness and four others occupied the rear seat. They were going to the home of the witness, who lived just east of State Street on Whitlock Avenue (2500 South).

As the defendant drove north along State Street, there was nothing unusual about his driving, nor did the car skid at any time until just before the accident. As the car

started up from 33rd South (where they had stopped for a traffic light) the wheels spun briefly before getting traction, but otherwise everything was alright. "We was going down State Street normal and everybody talking, and felt the back end start sliding around" and right after that the accident occurred. The witness estimated the speed of defendant's car to be approximately 30 to 35 miles per hour although he did not look at the speedometer. After the accident and before the police arrived defendant's automobile was moved from the position it was in when it first came to rest. The witness further stated that the hood of defendant's automobile was lying right beside the car after the accident, but that it was picked up and moved off the street before the police came to investigate.

On cross-examination Donald Rice reaffirmed that the automobile was traveling northward between thirty and thirty-five miles per hour; that nothing unusual occurred until he felt the back end go around—toward the left— causing the automobile to go over onto the opposite side of the road; that prior to the skidding the car had been traveling in the lane next to the center of the road; that he knew of nothing that could have caused the automobile to skid unless the car struck an icy spot. The road was bare in places and icy in other places.

Van E. Porter, a press photographer, testified that at approximately 12:15 a.m. on the morning of December 17, 1948, he took some photographs of two automobiles at or near 2800 South State Street. Exhibits A and B were taken showing the damaged condition of a Packard automobile; while Exhibits C and D showed the damaged condition of a Buick automobile. He also took a photograph of what appeared to be a motor from the Buick automobile as shown by Exhibit E. On cross-examination he admitted that his purpose in taking the pictures (Exhibits A to E, inclusive) was so that they might be published in connection with a news item on the accidents and that his

attention was directed particularly to the damaged portion of the cars, his object being to accentuate the damaged areas. He also testified that he had no way of knowing how the two vehicles or the motor happened to be in the position they were at the time he took the pictures.

Russell Cederlund, a State Highway Patrolman, personally investigated the accident, arriving at the scene shortly after midnight, and made certain measurements as to the location of the vehicles and objects on the road. From his observations he prepared a diagram which was introduced in evidence as Exhibit F. Near the bottom of the diagram, the officer marked an "X" to indicate the "possible point of impact" of the two automobiles. The evidentiary factors considered by him in arriving at this point were the debris, skid marks, gouge marks, and scratches on the highway. His measurements indicated that the "X" was 16 feet west of the center of the highway and 12 feet east of the west edge of the hard surface. Twenty-five feet northwesterly from the point "X" was located the Packard automobile, facing in an easterly direction, while 77 feet northerly from the same point the Buick automobile was found upright, and facing in a northeasterly direction. The motor was located by the officer off the highway, south and east of the Buick, approximately 75 feet, while the hood was north and west off the highway, a distance of 177 feet from the Buick automobile. He further testified that the highway was icy in the portion which had been used by the traffic, but that on each side of the icy traveled way was an area of hard packed snow.

The officer then identified Exhibit G as being a statement taken by him and officers DeVine and Fogle from the defendant at the County Hospital approximately one and one half hours after the accident. The officer admitted that at the preliminary hearing he had testified from his independent recollection that the defendant had said he

had had 3 or 4 beers when giving the statement. He also testified that both at the scene of the accident and later at the hospital the defendant appeared in all respects to be normal and in complete control of his faculties, except for being upset and nervous. There was nothing irregular about any of his activities or his talking or anything else.

Exhibit "G" also contains a purported remark by the defendant to the effect that he was about to pass another car when it pulled into the lane in which defendant was driving thereby causing defendant to apply his brakes which resulted in his car skidding. In explanation of this statement the officer testified that the defendant told him that as the defendant was proceeding in the lane next to the center of the highway, a car to his right (in the center lane for northbound traffic) pulled over in front of the defendant's automobile so that he was required to slow up and that in attempting to do so his car started to skid and went out of control. State Street at the place where the accident occurred is normally a six-lane highway—three lanes for traffic in each direction. Apparently on the evening of the accident, there were at least two lanes being used by traffic in each direction although the officer was unable to state whether one or two lanes were being used by traffic that evening.

The officer admitted on cross-examination that he did not know how or when the vehicles and the motor and hood arrived at the point where he measured them to be in his investigation. Although the Buick motor was apparently severed from its mountings, those mountings were made of rubber.

Exhibit "G" reads:

"I was at the Stork Club about 2½ Hrs. I had about 6 or 7 glasses of beer. We left the Stork Club and drove north on State. I was going to pass another vehicle who was driving in center lane but he moved into left lane and I put on the brakes and I lost control of my vehicle.

"I give this statement without any promises or threats whatsoever.

"/s/ Jack L. Clark"

Officer Charles Glen Fogle testified that he was with Officer DeVine and that they were the first officers to arrive at the scene of the accident. While he made no measurements he observed the general location of the cars and objects and believed that they were in the position shown by Officer Cederlund. He was further present when Officer Cederlund took the statement from the defendant and he witnessed it.

Officer Raymond DeVine assisted Cederlund in taking the measurements and later was present when defendant's statement was taken, which statement he witnessed.

Victor W. Jones, a witness for the defendant, testified that he arrived at the scene of the accident shortly after it occurred and prior to any police officer; that he helped to right the Buick automobile which was lying on its side; and that thereafter he observed the motor lying just east of the center line of the highway. In lifting up the Buick car it was moved to the west so that the car was then just west of the center and the motor was lying just east of the center line of the highway.

Jack L. Clark, the defendant, in addition to corroborating the witness Rice as to the people who were riding in the car; their destination; the speed at which they were traveling; the condition of the road— to the effect that it was bare in spots and icy in spots; and the automobile was proceeding normally in the lane next to the center prior to the time it began to skid, also explained the cause of the car skidding onto the wrong side of the road substantially as contained in the written statement taken by Officer Cederlund, but in more detail. He testified that as he stopped for the traffic light at 33rd South he was in the middle of the three lanes for northbound traffic; that as he started up, he waited until the cars to his left went on ahead and then he moved over into the lane next to the center and proceeded in the line of traffic northward. As

they were traveling along—the car ahead being about 50 feet in front of the Buick car, defendant testified that a car in the lane to his right (the middle lane for northbound traffic) proceeded to pull over into the lane in which defendant was traveling and immediately ahead of his car, thereby requiring him to attempt to slow up, in order to keep from striking the other car or at least coming too close to it. Immediately upon his applying the brakes he felt the back end go out and the car skidded to the left into the lane immediately west of the center line of the highway. He saw the other car coming and cramped his wheels to see if he could get out of its way, but was unable to do so and the cars collided.

This summary of the testimony is taken from appellant's brief, with some deletions, in view of the fact that the respondent accepts it as a very complete summary.

In *State* v. *Lingman,* 97 Utah 180, 91 P. 2d 457, we defined criminal negligence as reckless conduct, or conduct evincing a marked disregard for the safety of others. The court in the present case so instructed this jury, and that is the law that has been applied in this jurisdiction consistently since the Lingman decision. *State* v. *Busby,* 102 Utah 416, 131 P. 2d 510; *State* v. *Newton,* 105 Utah 561, 144 P. 2d 290; *State* v. *Riddle,* 112 Utah 356, 188 P. 2d 449; *State* v. *Bleazard,* 103 Utah 113, 133 P. 2d 1000; *State* v. *Barker,* 113 Utah 514, 196 P. 2d 723; *State* v. *Thatcher,* 108 Utah 63, 157 P. 2d 258.

What is it that Clark did or did not do that shows he drove recklessly or with a marked disregard for the rights of others? We asked a similar question in the case of *State* v. *Gutheil,* 98 Utah 205, 98 P. 2d 943. We also said, there, that a criminal case requires proof of each element of the crime by evidence that convinces one beyond all reasonable doubt of the existence of each such element; and further, that from the fact of death alone we

do not presume that any one was at fault. In that case we could not point out what defendant did to evidence recklessness or a marked disregard for the safety of others. Can we in this case?

In *State* v. *Adamson,* 101 Utah 534, 125 P. 2d 429, we held that mere negligence is not sufficient to authorize a verdict of manslaughter. In that case Mr. Justice WOLFE in his concurring opinion suggests a test of accused's actions by their probable effect upon a watchful and intelligent officer on the corner who noticed accused's conduct—could he have successfully founded a prosecution for reckless driving upon what he saw?

The lower court submitted two alternatives to the jury: (1) Was defendant driving at an excessive rate of speed under the attendant circumstances; (2) Did defendant drive to the left of center while overtaking and passing another vehicle, and at a time when the left side of the highway was not free of traffic for such a distance ahead as would enable him to accomplish the passing in safety?

In *State* v. *Riddle* cited above, we held that the question of criminal negligence was for the jury where defendant got part or all of his automobile over on the left hand side of the road. The majority of the court seemed to believe that if the driver, upon a blind curve, permitted his car to get on the left side of the road, and failed to see an approaching car, he was guilty of criminal negligence, and reasonable minds could not find otherwise.

Applied to the present case, if the jury concluded that defendant permitted his car to get on the left side of the road, on a straight stretch where he could easily have seen the oncoming car of Jack R. Price, there seems to be even greater reason for concluding that his conduct was reckless, and the verdict under such circumstances should be upheld. The question then would arise: Does the evidence justify such a conclusion? Permitting his car to get upon

the left side of the road contemplates carelessness as to where he is driving. It does not necessarily include skidding onto that side, as the result of losing control of his machine when driving it in its proper lane, unless there was something careless or negligent in the manner of driving it in its proper lane, that would indicate to the reasonably safe driver that he might lose control of his car. Under these circumstances, if they existed, the carelessness or negligence would be found in the manner of driving rather than in the place of driving.

The evidence in this case is rather weak in its support of the conclusion that defendant drove his car on the left hand side of the center line. We doubt that alternative No. 2 was the foundation of the verdict, although there is some evidence to support it.

In alternative No. 1 we have a more serious question. Defendant's speed was anywhere from 30 to 35 miles per hour. The roads were icy, his car was crowded—the jury might well have believed that it was over-crowded, and if they believed defendant, he suddenly had to apply his brakes due to the actions of a driver to his right at which time he lost control of his car. The cars were both badly smashed when they came together. Would not such facts justify a jury in concluding that defendant's negligence was more than simple negligence? We think the jury might so conclude. They might well reason the case out this way: a person driving with an overloaded car on icy roads, at that rate of speed and in traffic the unexpected movement of any vehicle of which might call for the application of brakes, should realize the practical danger he was in; and if he failed to respond to such a warning of circumstances, he was reckless and indifferent of consequences. There is no hard and fast rule for measuring recklessness. One need only glance at the numerous citations and cross references in *People* v. *Grogan*, 260 N.

Y. 138, 183 N. E. 273, 86 A. L. R. 1273 to realize that. In reviewing the decision of the jury, it becomes a question of whether or not a given set of circumstances is in the mind of reasonable persons sufficient foundation to justify a conclusion of recklessness. All reasonable minds might not themselves have concluded as did the jury but if it cannot properly be said that others who so concluded were unreasonable in arriving at such a conclusion then those circumstances should support a conclusion of criminal negligence. Such is the situation before us. We cannot say that, from the facts given them, the jury was unreasonable in concluding that defendant's driving was reckless and in a marked disregard for the safety of others. We have tried to illustrate above, a possible view of the evidence that the jury could have taken to arrive at such a conclusion. Naturally, if the evidence will support such a conclusion—and we think it will—this was a question for the jury.

Appellant argues this point on the theory that the evidence is only circumstantial. We believe counsel is in error in his view point of the evidence. The issue is: Was appellant criminally negligent? Negligence in any degree is measurable by comparison with what we believe a reasonable person would do under the same or similar circumstances. Its existence or non-existence lies in inferences drawn from a given state of facts. We have direct evidence of defendant's speed, his manner of driving, location of his driving, icy roads and other details. The question is: What do such facts indicate as to the conduct of the defendant in his control of his automobile? Counsel seeks to view the case as one would see it after the collision, and without any direct evidence of what occurred prior to the collision. That, we believe, is an erroneous view of the case.

Another objection raised by appellant is that the court failed to instruct the jury that they must all agree upon

the ground or grounds they adopt as the basis for conviction—in other words, some of the jury should not decide guilt upon alternative No. 1 and the others on alternative No. 2, and thus by two different routes arrive at the same goal.

Paragraph 2 of instruction No. 7 dealing with the elements of the offense lists the 2nd element as: "That he drove the automobile at a rate of speed greater than was reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing, or that he drove an automobile to the left side of the center of the roadway while overtaking and passing another vehicle proceeding in the same direction at a time when the left-hand side of the highway was not free of oncoming traffic for such a sufficient distance ahead as to permit him to complete the pass and return to the right-hand side of the highway in time to avoid a collision with an automobile proceeding in the opposite direction. That in committing one or both of the acts set forth herein the defendant was guilty of criminal negligence as defined herein."

As will be seen, paragraph 2 states the manner of driving in the alternative, as we have discussed them above. Paragraph 4 then says that each element of proof—which includes either alternative of paragraph 2, as selected by the jury, or both elements, if selected—must be proven beyond all reasonable doubt. The paragraph following No. 4 reads: "It is not enough that the State prove one or more of the elements set forth above, but it is necessary in order to justify a verdict of guilty that each of the four elements set forth above be proved to your satisfaction and beyond a reasonable doubt."

Now the elements are numbered and consist of four, with No. 2 in the alternative. It would seem to be a reasonable interpretation of this entire instruction to say that if the

jury must agree upon the elements to find a verdict, they must agree upon either of the alternatives they may select, or both if they select both. Those are the reasonable inferences to be drawn from the instruction.

Appellant's last point is that the court erred in failing to give the following requested instruction: "You are instructed that the fact that an automobile skids or slides while proceeding along a wet or slippery street is no evidence that the party is operating the same at an excessive rate of speed or in a careless or negligent manner."

This request is misleading. Probably what was intended was that such skidding alone is not sufficient evidence of careless or negligent driving. It is evidence, however, that may be considered along with other evidence in determining carelessness or negligence.

We find no prejudicial error in the decision, and therefore it is affirmed.

WADE, J., concurs in the opinion of PRATT, C. J., and also in the views expressed by McDONOUGH, J.

WOLFE, J., concurs in the opinion of PRATT, C. J., and also in the observations of LATIMER, J.

LATIMER, Justice, I concur.

The problem in this case is to decide whether or not the acts of the defendant were sufficiently aggravated to justify the jury in finding him guilty of criminal conduct. The dividing line between civil and criminal neglect is indistinct and troublesome to determine, so we encounter difficult decisions in borderline cases. However, I believe when due consideration is given to all elements disclosed by this record the finding of guilty can be affirmed. The facts which lead me to that conviction are mentioned in

the prevailing opinion but are not emphasized in the summation. I, therefore, choose to amplify the facts related in Chief Justice PRATT'S opinion.

It is hardly possible to describe the physical appearance of the two automobiles after the accident and detail the physical surroundings so as to portray accurately the force of the impact between the automobiles. But the damage done to the two cars, their location after the collision, and the distance some of the parts were hurled by the impact, lead me to believe the jury could reasonably find that the defendant was traveling at a much greater speed than he was willing to admit. In this connection, the evidence showed that his speedometer had not worked for some considerable period of time and his estimate of speed was based on his familiarity with the operation of his car. He estimated he was traveling 30 to 35 miles an hour just before the collision, but the record impresses me with the fact that he gave himself the benefit of every doubt when he made that estimate. Both cars were literally demolished; the Packard automobile, which was being driven south, was driven back to the north a distance of 25 feet; the hood of the Buick automobile which was being driven by the defendant was found 254 feet from the place of the collision; and the motor of the Buick (which weighed 590 pounds) was broken off from its mountings and at the time the officers arrived was approximately 100 feet from the point of impact and 75 feet from where the Buick automobile came to rest. A witness for the defendant testified that prior to the arrival of the police officer he helped move the motor from a position on the highway as it was interfering with north-bound traffic. While he does not state the distance it was from the point of impact prior to the time it was moved, his testimony establishes that it would be at least 20 feet east and considerably north of where the collision **occurred.**

The officer's testimony portrays driving conditions as being very slippery and hazardous. I believe the reference in the majority opinion to lanes of traffic is a little misleading in view of the fact that the highway was covered with snow and ice and the dividing lines were not visible. The only line which could be seen, according to the officer's testimony, was the center yellow line and this was visible under the ice. On the east side of the highway there was a 12-foot surface immediately to the east of the center line which had been used as the main travelled portion on that side of the road. That part had been worn down by constant traffic while the balance of the highway was covered with packed snow and appeared as not having been well traveled. If we accept defendant's story that there were cars immediately preceding him, it would be a fair inference from the testimony that they were traveling along the 12-foot surface which had been used extensively. There were no dry spots on that portion of the highway, as the officer testified that from the stop sign at 33rd South Street and surface was covered with solid ice. The only dry place he observed was at that intersection, which had been sanded.

The accident happened 16 feet to the west of the center line so that the defendant had crossed over and was better than half-way across the west half of the street when the collision occurred. This is not one of those cases where the impact was close to the center and the driver might have been mistaken as to the exact location of the center line. Rather, this is a case where the offending car proceeded a long way across the wrong side of the road to collide with the south-bound car.

From these facts I believe the jury could conclude: That the defendant, who had driven down the highway earlier that evening, was familiar with road conditions; that he knew the surface of the road was extremely dangerous and covered with ice; that he was driving 35 miles per hour or

faster, close to the center line of the highway; that such a rate was reckless and, in view of the traffic conditions, was in marked disregard of the rights of others; that when he attempted to go around the other vehicles he knew that other drivers were faced with difficult driving conditions; and that he knew that if it became necessary to make an unexpected movement control of all cars would be difficult.

Moreover, if the jurors accepted his statement as to his movements given shortly after the accident they could find he was attempting to pass a car which in all probability was not more than 12 feet east of the center line; that he attempted to go around it at a time when he could see cars approaching on the other side of the highway and when he knew a slight deviation in direction might result in his skidding into the path of the oncoming automobile.

The road conditions must have been such that any driver would know he was taking a reckless, unwarranted and substantial risk in passing a car so close to the center line, and, that unless conditions turned out very favorably he would be unable to prevent his car from skidding out of control. Under such a set of facts and circumstances, I believe the jury could reasonably find that the defendant's driving was more aggravated than ordinary negligence and reached the level of the criminal type.

McDONOUGH, Justice (concurring in result).

I concur in the result and in most of what is said in the opinion of Mr. Chief Justice PRATT. I am of the opinion, however, that there is no evidence in the record from which the jury could conclude that the defendant consciously drove his car over the center line of the highway and on to the left side thereof. The opinion of the Chief Justice states: "The evidence in this case is rather weak in its support of the conclusion that defendant drove his car on the left hand side of the center line."

As indicated, I believe that there is no evidence in the record which would support such a conclusion. True, in Exhibit "G" set out in the opinion of the Chief Justice, is found the following:

"I was going to pass another vehicle who was driving in center lane but he moved into left lane and I put on the brakes and I lost control of my vehicle."

Even taking that statement without further explanation thereof, I think it not susceptible of an interpretation that the defendant was passing another vehicle and in doing so drove on the wrong side of the highway. Could such statements standing alone be so construed, the construction is precluded by the testimony of the officer who took the statement. Officer Cederlund, on cross-examination as to the conversation of the defendant, of which Exhibit "G" purports to be the record, testified: "A. As I remember, he told me that he was driving down the center lane of the northbound traffic and was going to pass a vehicle going in the same direction. As he went to pass, this car moved over in front of him, and he put on his brakes and lost control of the vehicle.

"Q. As a matter of fact, he did state to you at that, did he, Officer Cederlund, that the other car moved in front of him as he was proceeding in the lane next to the center, and at that time he had slowed up and lost control of the car? A. I believe that is just what I stated."

The foregoing testimony of Officer Cederlund is nowhere contradicted or modified in the record. It is, therefore, clear beyond doubt that the defendant did not drive over on to the left hand side of the highway in order to pass the vehicle in front of him but rather that another car having moved in from the lane to his right, he applied his brakes and as a consequence his car skidded onto the wrong side of the highway.

The physical condition of the highway was not such that

several lanes of traffic might not proceed northward thereon. The same witness for the state testified as to the condition of the highway. He stated while pointing to an exhibit: "A. This line here was visible in the highway and approximately half of this lane and half of this lane, approximately twelve feet or it was twelve feet was worn down to the hard surface of the road. From here to here or to here was hard-packed snow, and from here to here on the shoulder was hard-packed snow.

"Q. Then, generally speaking, the ice was along the lane the automobiles had been traveling most frequently, and then on either side of that lane was hard-packed snow? A. Yes, sir."

In view of the state of the record as indicated, it is clear that if the submission of the case to the jury is to be upheld, it must be on the basis of other conduct on the part of the defendant which it is asserted constituted conduct in marked disregard of the safety of others. While the question is not without doubt, I am of the opinion that taking into consideration all of the evidence in the record relative to the excessively slippery condition of the highway; the rate of speed at which the defendant was admittedly traveling; the condition of his tires, three of which under the testimony of an investigating officer had the treads entirely worn away; plus the fact that the defendant was driving a car overloaded with passengers, there was sufficient evidence to permit the jury to determine whether so driving was in marked disregard of the safety of others.

I, therefore, concur.